UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

TOMMY LEE CROW, JR,

               Petitioner,

    v.

RON HAYNES,

               Respondent.

CASE NO. 3:16-cv-05277-RJB-JRC

REPORT AND RECOMMENDATION

NOTED FOR:  September 4, 2020

      The District Court has referred this petition for a writ of habeas corpus to United States Magistrate Judge J. Richard Creatura.  The Court's authority for the referral is 28 U.S.C. § 636(b)(1)(A)–(B) and local Magistrate Judge Rules MJR3 and MJR4.

      Petitioner challenges his 2009 convictions for the second-degree murders of David Miller and Norman Peterson and for arson, bringing suit under 28 U.S.C. § 2254.  Petitioner raises multiple grounds for relief but fails to show that the state courts unreasonably or incorrectly applied clearly established federal law or unreasonably determined the facts based on the evidence before them.  The habeas petition should therefore be denied.

1

# FACTUAL HISTORY

2

### I.  Petition

3

Petitioner brought this matter in April 2016.  Dkt. 1.  Petitioner's amended petition

4

presents nine grounds for relief:  (1) that the trial court unconstitutionally allowed evidence of a

5

prior assault, (2) that his trial counsel was ineffective for failing to move to exclude the prior

6

assault evidence, (3) that the trial court's limiting instruction regarding the prior assault evidence

7

was unconstitutional, (4) that his trial counsel was ineffective for failing to object to the limiting

8

instruction, (5) that an accomplice liability instruction relieved the State of its burden of proof,

9

(6) that the prosecutor went beyond arguing inferences from the trial evidence and improperly

10

expressed personal opinion in the closing argument, (7) that the prosecutor failed to disclose

11

material exculpatory evidence and coerced a State witness to give false testimony, (8) that

12

appellate counsel was ineffective for failing to raise several arguments, and (9) that the jury's

13

verdict was not unanimous.  *See generally* Dkt. 10.

14

The Court directed service of petitioner's amended petition and then stayed the matter

15

until September 2019 while petitioner pursued his remedies in state court.  *See* Dkts. 21, 24, 45.

16

*See* Dkt. 45.  In January 2020, respondent filed the Answer and partial state court record of

17

proceedings.  Dkts. 51, 52.  At the Court's direction, respondent later supplemented the record of

18

proceedings with the remainder of the trial transcript.  *See* Dkt. 63.

19

Petitioner has filed a response to the Answer, and the matter is now ripe for review.  *See*

20

Dkts. 66, 67.

21

### II.  State Court Proceedings

22

The state court record of proceedings filed by respondent sets forth the following history.

23

///

24

**A.  Trial and Direct Appeal**

On March 20, 2009, a jury found petitioner guilty of two counts of second-degree murder and one count of second-degree arson, based on the killings of Petersen and Miller in March 2008.  *See* Dkt. 52-1, at 2.  The trial court sentenced petitioner to 660 months in prison, running his murder sentences consecutively and imposing exceptional sentences.  Dkt. 52-1, at 6; Dkt. 52-4, at 120.

Petitioner appealed, and in October 2010, Division Two of the Washington State Court of Appeals affirmed his convictions.  Dkt. 52-1, at 17.  Division Two summarized the facts of the case as follows:

> Mr. Crow, along with Bryan Eke and Christopher Durga, assaulted Scott Cover with a baseball bat in early March 2008; they severely injured him.  Mr. Cover wound up in the hospital for six days.  Justin Van Horn and Karen Ann Schaeffer, both acquaintances of Mr. Cover, visited him in the hospital.  Mr. Cover asked Ms. Schaeffer to tell Mr. Crow and Mr. Eke that he had not told police that they were responsible for the assault.
> David Miller saw the assault on Mr. Cover.  Officer Bryan Henry arrested Mr. Miller on an unrelated outstanding warrant, and, while in custody, Mr. Miller told Officer Henry that Mr. Eke and Mr. Durga had assaulted Mr. Cover.
> On March 27, 2008, Officer Henry found Mr. Durga and followed him to a campsite in the woods where Mr. Durga lived.  Officer Henry told Mr. Durga that he had information that Mr. Durga was involved with Mr. Cover's assault and that a baseball bat had been used.  Officer Henry had previously seen a baseball bat at Mr. Durga's campsite, and asked him about it; Mr. Durga gave the bat to Officer Henry, who then left.
> Mr. Durga told Mr. Crow and Mr. Eke that the police had taken the bat.  The three were upset and asked around about who had told police that they assaulted Mr. Cover.  They ultimately confronted Mr. Miller and accused him of telling police about Mr. Cover's assault.  One of the three drew a line in the dirt with his shoe and said to Mr. Miller, "You've crossed the line." [Citation omitted.]  Another said, "I'm gonna fuck you up." [Citation omitted.]
> Later that evening, around 10:30 pm to 11:00 pm, Messrs. Crow, Eke, and Durga discussed how to resolve the situation and decided to murder Mr. Miller and burn his body.
> The three went to Mr. Miller's camp around 1:00 am on March 28.  Mr. Crow confronted Mr. Miller, "Why did you turn us in.  I thought we were family?" [Citation omitted.]  Mr. Crow struck Mr. Miller in the face, and Mr. Durga choked him until he was unconscious.  Mr. Durga then dragged Mr. Miller's body into a

REPORT AND RECOMMENDATION - 3

1

2    campsite fire.  Norman Peterson showed up at Mr. Miller's camp and saw Mr.
     Miller's body halfway into a fire.  Mr. Crow struck Mr. Peterson in the head with
     a tree limb, wrestled him to the ground, choked him, and eventually threw him in

3    the fire with Miller.  Both Mr. Crow [sic] and Mr. Peterson died from asphyxia,
     most likely by strangulation.

4    Dkt. 52-1, at 18–19.

5          As relevant here, petitioner argued before Division Two that the trial court erred when it

6    allowed evidence of his prior assault on Scott Cover, when it gave a limiting instruction related

7    to the prior assault evidence, and when it instructed the jury on accomplice liability.  *See* Dkt.

8    52-1, at 21–25.  Division Two rejected these arguments and later denied petitioner's motion for

9    reconsideration.  *See* Dkt. 52-1, at 136.  In March 2011, the Washington State Supreme Court

10   denied petitioner's motion for discretionary review.  *See* Dkt. 52-1, at 173.

11                          **B.  Collateral Review**

12         Petitioner filed a personal restraint petition ("PRP"), and Division Two remanded the

13   matter for a reference hearing based on co-defendant and State witness Christopher Durga's

14   recantation.  *See* Dkt. 52-1, at 38; Dkt. 52-3, at 70.

15         Following the reference hearing, Division Two granted the PRP in part, finding that error

16   in sentencing petitioner required a remand for resentencing.  Dkt. 52-1, at 37.  However,

17   Division Two rejected petitioner's challenges to the validity of his convictions based on

18   arguments that Durga gave false testimony, that the prosecutor committed misconduct (Dkt. 52-

19   1, at 43), that petitioner's trial counsel rendered ineffective assistance (Dkt. 52-1, at 46), and that

20   his right to a unanimous jury was violated.  Dkt. 52-1, at 51.  Division Two denied petitioner's

21   request for reconsideration (Dkt. 52-4, at 15), and the Supreme Court denied review of Division

22   Two's opinion inasmuch as Division Two rejected the challenges to petitioner's convictions.

23   Dkt. 52-4, at 32.

24

### C. Resentencing

At petitioner's resentencing, the Court imposed a total sentence of 600 months, which Division Two affirmed on direct appeal.  *See* Dkt. 52-4, at 119, 122.  Petitioner then sought review by filing a PRP in Division Two, arguing that there was insufficient evidence to support a special verdict related to the Peterson murder.  *See* Dkt. 52-4, at 278.  Division Two dismissed the PRP (Dkt. 52-4, at 279), and the Supreme Court denied discretionary review.  Dkt. 52-5, at 4.

### EVIDENTIARY HEARING

The decision to hold a hearing is committed to the Court's discretion.  *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).  "[A] federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief."  *Landrigan*, 550 U.S. at 474.  In determining whether relief is available under 28 U.S.C. § 2254(d)(1), the Court's review is limited to the record before the state court.  *Cullen*, 131 S.Ct. at 1388.  A hearing is not required if the allegations would not entitle petitioner to relief under 28 U.S.C. § 2254(d).  *Landrigan,* 550 U.S. at 474.  "It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing."  *Id.*; *see also Cullen,* 131 S. Ct. 1388 (2011).  The Court does not find it necessary to hold an evidentiary hearing because, as discussed in this report and recommendation, petitioner's grounds for relief may be resolved on the existing state court record.

*///*

1

**DISCUSSION**

2

**I. Legal Principles:  Antiterrorism and Effective Death Penalty Act of 1996**

3       The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") "bars relitigation

4   of any claim 'adjudicated on the merits' in state court, subject only to the exceptions set forth in

5   [28 U.S.C.] §§ 2254(d)(1) and (d)(2)."  *Harrington v. Richter*, 562 U.S. 86, 98 (2011).

6       The first exception, § 2254(d)(1), allows habeas relief on the basis that an adjudication

7   "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly

8   established Federal law, as determined by the Supreme Court of the United States."  The

9   Supreme Court has ruled that a state decision is "contrary to" clearly established Supreme Court

10  precedent if the state court either (1) arrives at a conclusion opposite to that reached by the

11  Supreme Court on a question of law, or (2) confronts facts "materially indistinguishable" from

12  relevant Supreme Court precedent and arrives at an opposite result.  *Williams v. Taylor*, 529 U.S.

13  362, 405 (2000).

14      Moreover, under § 2254(d)(1), "a federal habeas court may not issue the writ simply

15  because that court concludes in its independent judgment that the relevant state-court decision

16  applied clearly established federal law erroneously or incorrectly. Rather, that application must

17  also be unreasonable." *Id*. at 411; *see Lockyer v. Andrade*, 538 U.S. 63, 69 (2003). An

18  unreasonable application of Supreme Court precedent occurs "if the state court identifies the

19  correct governing legal rule from [Supreme Court] cases but unreasonably applies it to the facts

20  of the particular state prisoner's case." *Williams*, 529 U.S. at 407.  In addition, a state court

21  decision involves an unreasonable application of Supreme Court precedent "'if the state court

22  either unreasonably extends a legal principle from [Supreme Court] precedent to a new context

23  where it should not apply or unreasonably refuses to extend that principle to a new context where

24

1    it should apply.'"  *Walker v. Martel*, 709 F.3d 925, 939 (9th Cir. 2013) (quoting *Williams*, 529

2    U.S. at 407).

3          The second § 2254 exception, § 2254(d)(2), provides for habeas relief if the adjudication

4    "resulted in a decision that was based on an unreasonable determination of the facts in light of

5    the evidence presented in the State court proceeding."  Federal habeas courts must presume the

6    correctness of state courts' factual findings unless applicants rebut this presumption with "clear

7    and convincing evidence."  28 U.S.C. § 2254(e)(1).  Further, review of state court decisions

8    under §2254(d)(1) is "limited to the record that was before the state court that adjudicated the

9    claim on the merits."  *Cullen v. Pinholster*, 563 U.S. 170, 180-81 (2011).

10         **II.  Grounds One through Four:  Admission of Evidence of Prior Assault**

11         Petitioner's first four grounds for relief pertain to the trial court's admission of evidence

12   that petitioner participated in the assault of Scott Cover.  Petitioner argues that it was error to

13   allow evidence of the Cover assault, that the limiting instruction that the trial court gave to cure

14   any prejudice was flawed, and that his counsel rendered ineffective assistance by failing to

15   obtain exclusion of the Cover assault evidence or to object to the curative instruction.  *See* Dkt.

16   10-1, at 2–8.  These arguments are addressed in turn.

17         **A.  Facts Relevant to the Prior Assault Evidence**

18         Before petitioner's trial, the trial court ruled on the State's request to admit evidence of

19   the Cover assault under Washington Rule of Evidence ("ER") 404(b) ("Evidence of other crimes,

20   wrongs, or acts is not admissible to prove the character of a person in order to show action in

21   conformity therewith.  It may, however, be admissible for other purposes, such as proof of

22   motive. . . .").  *See* Dkt. 52-5, at 52.  The State made an offer of proof about the incident (*see*

23   Dkt. 52-5, at 55) and stated that the evidence established a motive for the confrontation with and

24

1    murder of Miller—namely, retaliation for Miller "snitching" about the Cover assault.  *See* Dkt.

2    52-5, at 56.

3          Over defendant's objection (Dkt. 52-5, at 65), the trial court allowed the Cover assault

4    evidence, finding by a preponderance of the evidence that Crow assaulted Cover, that evidence

5    of the assault was materially relevant to establish a motive for Miller's murder, and that the

6    probative value of the evidence was much greater than the prejudicial effect.  Dkt. 52-5, at 74–

7    77.  The trial court gave a limiting instruction regarding the evidence.  *See* Dkt. 52-5, at 77.

8          On appeal, petitioner asserted that the trial court erred in allowing the evidence of the

9    prior assault on Cover, but Division Two disagreed and held that the evidence was admissible as

10   evidence of "prior bad acts."  Dkt. 52-1, at 20.  Division Two also disagreed that the trial court's

11   limiting instruction was improper, holding—

12          In sum, the instruction appears to do exactly what ER 404(b) requires—limit
            consideration of the prior bad acts evidence.  It is modeled on 11 *Washington*
13          *Practice: Washington Pattern Jury Instructions: Criminal 5.30,* at 180-81 (2008)
            (WPIC).  The wording did not convey the trial court's personal belief but rather
14          limited consideration of certain evidence in accordance with ER 404(b).  And any
            requests for fine tuning should have been made in the trial court, not here on appeal.
15          ER 103.

16   Dkt. 52-1, at 23.  Finally, Division Two concluded that given these resolutions, it did not need to

17   address petitioner's argument that his attorney was ineffective for failing to raise the issues that

18   petitioner argued regarding the admissibility of the Cover assault evidence and the jury

19   instruction.  Dkt. 52-1, at 25.

20          The Supreme Court denied review.  Dkt. 52-1, at 173.

21                    **B.  No Due Process Violation**

22          A state court's evidentiary ruling is not subject to federal habeas corpus review unless the

23   ruling violates federal law, either by infringing upon a specific federal constitutional or statutory

24

1   provision or by depriving the defendant of the fundamentally fair trial guaranteed by due

2   process. *Estelle v. McGuire*, 502 U.S. 62, 67 (1991).

3          Washington law requires that, to admit evidence of "prior bad acts," a trial judge must

4   "(1) find by a preponderance of the evidence that the misconduct occurred, (2) identify the

5   purpose for which the evidence is sought to be introduced, (3) determine whether the evidence is

6   relevant to prove an element of the crime charged, and (4) weigh the probative value against the

7   prejudicial effect." *State v. Gunderson*, 181 Wn.2d 916, 923 (2014) (internal quotation omitted).

8   Petitioner asserts that it was error to allow the evidence of the Cover assault under this standard

9   because the State did not establish that the events occurred by a preponderance of the evidence

10  and because the evidence was unfairly prejudicial. *See* Dkt. 10-1, at 2. But petitioner's

11  argument that the trial court improperly admitted the evidence under applicable Washington law

12  is not cognizable in a federal habeas petition. *See Estelle*, 502 U.S. at 67.

13         The question before the Court is whether the admission of the Cover assault evidence

14  violated the U.S. Constitution. On this point, the Supreme Court has expressly declined to rule

15  whether it is constitutional to use "propensity evidence"—that is, evidence that because a

16  defendant committed a criminal act in the past, he is likely to have committed the act for which

17  he is being tried. *See Garceau v. Woodford*, 275 F.3d 769, 774 (9th Cir. 2001) ("[T]he Supreme

18  Court has never expressly held that it violates due process to admit other crimes [propensity]

19  evidence for the purpose of showing conduct in conformity therewith, or that it violates due

20  process to admit other crimes evidence for other purposes without an instruction limiting the

21  jury's consideration of the evidence to such purposes. Indeed, the Supreme Court has expressly

22  declined to answer these questions."), *reversed on other grounds*, 538 U.S. 202 (2003).

23  Therefore, even if the Court were to agree that the Cover assault evidence was relevant only as

24

1    propensity evidence, petitioner cannot show that the state court's rejection of petitioner's claim

2    was contrary to, or an unreasonable application of, any "clearly established" federal law.  *See* 28

3    U.S.C. § 2254(d)(1).

4          In his responsive brief, petitioner relies on more general notions of fundamental fairness,

5    arguing that the admission of the Cover assault evidence rendered his trial fundamentally unfair,

6    in violation of due process.  *See* Dkt. 66, at 6–7.  Even if the Court ignores that there is no clearly

7    established Supreme Court law forbidding the use of propensity evidence, under Ninth Circuit

8    law, such evidence is admissible if there are permissible inferences the factfinder could have

9    drawn from the evidence.  *See McKinney v. Rees*, 993 F.2d 1378, 1381 (9th Cir. 1993); *Jammal*

10   *v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir. 1991) ("[e]vidence introduced by the prosecution

11   will often raise more than one inference, some permissible, some not; we must rely on the jury to

12   sort them out in light of the court's instructions.").

13         Here, the evidence of the Cover assault was probative regarding whether petitioner had a

14   motive to attack and murder Miller—the person whom the State argued petitioner, Eke, and

15   Durga suspected of "snitching" about the Cover assault.  This was a permissible inference that

16   the jury could draw from evidence of petitioner's prior bad acts that did not involve treating the

17   Cover assault as propensity evidence.  *See Williams v. Stewart*, 441 F.3d 1030, 1040 (9th Cir.

18   2006) (admission of evidence of uncharged burglary not unduly prejudicial and did not implicate

19   due process; evidence properly admissible to show identity and intent in trial for another

20   burglary where the crimes were similar), *cert. denied*, 549 U.S. 1002 (2006).  Moreover, because

21   the trial court gave a limiting instruction, the trial court mitigated much of the prejudice from the

22   admission of the Cover assault evidence by telling the jury not to consider the Cover assault

23   evidence for any purpose other than motive.

24

1    Petitioner's argument that the trial court improperly admitted the Cover assault evidence

2    therefore lacks merit.

3    ### C.  No Constitutional Error in the Limiting Instruction

4    Petitioner relatedly argues that the trial court's limiting instruction was inadequate.  *See*

5    Dkt. 66, at 8.  Much of his argument relies upon his claims that the trial court erred in finding by

6    a preponderance of the evidence that the events surrounding the Cover assault occurred as the

7    State claimed and that admitting the Cover assault evidence made his jury trial fundamentally

8    unfair.  *See* Dkt. 66, at 8.  As noted above, these arguments fail.

9    The limiting instruction given by the trial court stated—

10   I have allowed evidence and will allow Scott Cover to be admitted in this case for
     only a limited purpose.  This evidence may be considered by you only on the issue
11   of defendant's motive.  You may not consider it for any other purpose.  Any
     discussion of this evidence during your deliberations must be consistent with this
12   limitation

13   Dkt. 52-5, at 333–34.

14   Ordinarily, issues regarding jury instructions present questions of state law only and are,

15   therefore, not susceptible to federal habeas corpus review.  *Estelle*, 502 U.S. at 71–72.  A faulty

16   jury instruction requires habeas relief only if the instruction by itself so infected the entire trial

17   that the resulting conviction violates due process.  *Id.* at 72.

18   Petitioner argues that this instruction was too vague and would have misled the jury

19   because it failed to specify the motive for which the evidence could be considered.  Dkt. 10-1, at

20   6.  However, the record readily contravenes petitioner's claim that the instruction's ambiguity

21   about "motive" infected his trial with error.  As the state court found, it was clear from context

22   what "motive" was at issue: the State relied on the Cover assault as evidence showing motive for

23   petitioner, Eke, and Durga to confront Miller and ultimately, to attack him.  *See* Dkt. 52-6, at 57,

24

1   60.  And, inasmuch as petitioner argues that the instruction was improper because it allowed the

2   jury to consider the prior bad act evidence for an improper purpose—propensity—read in context

3   and as a whole, the instructions clearly and unambiguously told the jury not to consider the

4   evidence for such a purpose.  Thus petitioner fails to show that the state court's ruling on this

5   issue resulted in a decision that was contrary to, or involved an unreasonable application of,

6   clearly established federal law, as determined by the Supreme Court, or that it resulted in a

7   decision that was based on an unreasonable determination of the facts in light of the evidence

8   presented to the state courts.

9              **D.  No Showing That Counsel's Assistance Was Ineffective**

10          Petitioner argues that his counsel rendered ineffective assistance by failing to "properly

11   move" to exclude the evidence of the Cover assault and to object to the trial court's limiting

12   instruction.  Dkt. 10-1, at 4.

13          To prevail on a claim that counsel rendered ineffective assistance, a petitioner must show

14   both that "counsel's performance was deficient" and that "the deficient performance prejudiced

15   the defense."  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  To show prejudice, a

16   defendant "must show that there is a reasonable probability that, but for counsel's unprofessional

17   errors, the result of the proceeding would have been different."  *Id.* at 694.

18          Moreover, when reviewing a habeas claim that counsel rendered ineffective assistance,

19   the Supreme Court has explained—

20          the pivotal question is whether the state court's application of the *Strickland*
            standard was unreasonable.  This is different from asking whether defense
21          counsel's performance fell below *Strickland*'s standard.  Were that the inquiry, the
            analysis would be no different than if, for example, this Court were adjudicating a
22          *Strickland* claim on direct review of a criminal conviction in a United States district
            court.  Under AEDPA, though, it is a necessary premise that the two questions are
23          different.  For purposes of § 2254(d)(1), "an *unreasonable* application of federal
            law is different from an *incorrect* application of federal law."  [Internal citation

24

1      omitted.]  A state court must be granted a deference and latitude that are not in
       operation when the case involves review under the *Strickland* standard itself.
2
            A state court's determination that a claim lacks merit precludes federal
3      habeas relief so long as "fairminded jurists could disagree" on the correctness of
       the state court's decision.  [Internal citation omitted.]

4   *Harrington v. Richter*, 562 U.S. 86, 101 (2011).

5          Here, defense counsel did object to the admission of evidence about the Cover assault.

6   Dkt. 52-5, at 60.  Defense counsel is not required to continue to repeat an objection to the

7   admission of evidence after the trial court overrules the objection.  *E.g. Davis v. Chapman*, No.

8   19-1540, 2019 WL 8759093, at *2 (6th Cir. Dec. 4, 2019) (affirming a district court's conclusion

9   that "the state court reasonably found that trial counsel's strategy of not repeatedly objecting to

10  evidence where the court had already ruled against him was not ineffective assistance.").  Indeed,

11  such a strategy may undermine a defendant's case by highlighting the evidence at issue in front

12  of the jury.

13         Defense counsel did not, in contrast, object to the limiting instruction; in fact, defense

14  counsel reviewed the instruction and opined that it was "appropriate."  Dkt. 52-5, at 279.

15  However, as noted above, petitioner fails to show that the jury instruction either allowed the jury

16  to consider the Cover assault evidence for an improper purpose or misled the jury.  Thus, his

17  claim that defense counsel should have objected on this basis also lacks merit.

18         Petitioner fails to show that the state court unreasonably applied the law or determined

19  the facts regarding his claims of ineffective assistance of counsel regarding the Cover assault

20  evidence and instruction.

21      **III.  Ground Five:  Accomplice Liability Instruction**

22

23

24

Petitioner's fifth ground for relief is that the jury instruction regarding accomplice liability relieved the State of its burden of proof, allowing the jury to convict him based on mere presence. *See* Dkt. 10-1, at 10.

### A. Facts Regarding Accomplice Liability Instruction

The trial court instructed the jury regarding accomplice liability as follows:

> A person is guilty of a crime if it is committed by the conduct of another person for which he is legally accountable. A person is legally accountable for the conduct of another person when he is an accomplice of such other person in the commission of the crime.
> A person is an accomplice in the commission of a crime if, with knowledge that it will promote or facilitate the commission of the crime, he either:
> (1) solicits, commands, encourages, or requests another person to commit the crime; or
> (2) aids or agrees to aid another person in planning or committing the crime.
> The word "aid" means all assistance whether given by words, acts, encouragements, support, or presence. A person who is present at the scene and ready to assist by his presence is aiding in the commission of the crime. However, more than mere presence and knowledge of the criminal activity of another must be shown to establish that the person present is an accomplice.
> A person who is an accomplice in the commission of a crime is guilty of that crime whether present at the scene or not.

Dkt. 52-2, at 102. The Washington State Supreme Court has noted that this language "tracks the language of the accomplice liability statute." *State v. Dreewes*, 192 Wn.2d 812, 822 (2019)

On appeal, petitioner argued that the accomplice liability instruction was erroneous because it allowed for the conviction of a person who was present but unwilling to assist and who silently approved of the crime. *See* Dkt. 52-1, at 133. Division Two noted (and petitioner does not challenge) that petitioner failed to object to this instruction at trial. Dkt. 52-1, at 133. Division Two held that the instruction correctly stated Washington State law and did not misinform the jury that mere presence could form the basis for conviction. *See* Dkt. 52-1, at 134.

///

REPORT AND RECOMMENDATION - 14

1      **B. Legal Principles**

2          There is an "especially heavy" burden on a petitioner who seeks to show constitutional

3  error from a jury instruction that tracks a state statute. *Waddington v. Sarausad*, 555 U.S. 179,

4  190 (2009). "Even if there is some ambiguity, inconsistency, or deficiency in the instruction,

5  such an error does not necessarily constitute a due process violation. . . . Rather, the defendant

6  must show both that the instruction was ambiguous and that there was a reasonable likelihood

7  that the jury applied the instruction in a way that relieved the State of its burden of proving every

8  element of the crime beyond a reasonable doubt." *Id.* at 190–91 (internal quotations omitted).

9  "[T]he jury instruction may not be judged in artificial isolation, but must be considered in the

10  context of the instructions as a whole and the trial record." *Id.* at 191 (internal quotation

11  omitted). "[T]he pertinent question is whether the ailing instruction by itself so infected the

12  entire trial that the resulting conviction violates due process[.]'" *Id.* (internal quotation omitted).

13      **C. Discussion**

14          The Court does not review Division Two's holding that the instruction correctly stated

15  Washington State law. *Estelle*, 502 U.S. at 71–72. Instead, the Court must confine its review to

16  whether the instruction was ambiguous in such a way that it shifted the burden of proof from the

17  State. *See Waddington*, 555 U.S. at 190.

18          Here, Division Two properly concluded that the instruction did not misinform the jury

19  that mere presence alone could form the basis for a conviction. The jury instruction explicitly

20  directed the jury that presence alone was *insufficient* to form the basis for a conviction, stating

21  "more than mere presence and knowledge of the criminal activity of another must be shown to

22  establish that the person present is an accomplice." Dkt. 52-2, at 102. The instruction required

23

24

1    proof that petitioner knew that his conduct would "promote or facilitate the commission of the

2    crime."  Dkt. 52-2, at 102.

3         Because the instruction was unambiguous and directed the jury that presence alone was

4    not adequate to support a conviction, petitioner's argument about the accomplice liability

5    instruction fails to show that the Washington court unreasonably applied clearly established

6    federal law and therefore should be rejected.

7    **IV.  Ground Six and Seven:  Prosecutorial Misconduct**

8         Petitioner's sixth ground for relief is that the prosecutor committed misconduct by

9    improperly testifying during closing arguments, substituting his own opinions for the testimony

10   of Durga and Eke and exhorting them to "glean the truth."  Dkt. 10-1, at 12.  His seventh ground

11   for relief also pertains to alleged prosecutorial misconduct—petitioner claims that the prosecutor

12   failed to disclose evidence that would impeach Eke's testimony and threatened Durga, coercing

13   Durga to testify untruthfully.  Dkt. 10-1, at 15.

14   **A.  Closing Argument**

15   **1.  Legal Standard**

16        Prosecutorial misconduct warrants habeas relief only if it "so infected the trial with

17   unfairness as to make the resulting conviction a denial of due process."  *Darden v. Wainwright*,

18   477 U.S. 168, 181 (1986) (internal quotation marks omitted).  After establishing misconduct, a

19   petitioner also must show prejudice—that is, that the misconduct "rendered the trial

20   fundamentally unfair."  *See Wood v. Ryan*, 693 F.3d 1104, 1116 (9th Cir. 2012), *cert. denied*,

21   134 U.S. 239 (2013).  "[T]he touchstone of due process analysis in cases of alleged prosecutorial

22   misconduct is the fairness of the trial, not the culpability of the prosecutor."  *Smith v. Phillips*,

23

24

1  455 U.S. 209, 219 (1982).  The alleged misconduct must be examined within the context of the

2  entire trial.  *United States v. Young*, 470 U.S. 1, 12 (1985).

3      During closing arguments, a prosecutor is allowed a reasonably wide latitude and can

4  argue reasonable inferences from the evidence.  *United States v. Gray*, 876 F.2d 1411, 1417 (9th

5  Cir. 1989).  However, it is improper for a prosecutor to make statements or inferences to the jury

6  that he knows to be false or has a strong reason to doubt or to argue facts not in the evidence.

7  *Id.*; *United States v. Reyes*, 577 F.3d 1069, 1077 (9th Cir. 2009).

8  **2.  Christopher Durga's and Bryan Eke's Testimony**

9      The State presented the testimony of Bryan Eke and Christopher Durga, petitioner's co-

10  defendants, who had pleaded guilty to second-degree murder for Miller's and Petersen's deaths.

11  *See* Dkt. 52-6, at 231–32; Dkt. 63-1, at 722.

12  **a.  Eke's Testimony**

13      Eke testified that he was present when Cover was assaulted but that he did not

14  "remember too much" of what happened.  *See* Dkt. 63-1, at 729–30.  Eke stated that he was not

15  bothered when police retrieved the weapon used for the assault but that Durga "was kind of

16  concerned" and that Eke, Durga, and petitioner sought out the person who had "turned [them]

17  in."  Dkt. 63-1, at 732–33.  The three suspected Miller and, according to Eke, petitioner proposed

18  going to Miller's campsite to "harass him" and "beat him up."  Dkt. 63-1, at 745, 747.

19      According to Eke, the three went to the campsite, where petitioner and Durga confronted

20  Miller.  Dkt. 63-1, at 759, 761.  Eke stated that petitioner beat Miller up and that Durga choked

21  Miller unconscious, despite Eke's claimed efforts to intervene.  *See* Dkt. 63-1, at 759–63.  Durga

22  then placed Miller in the campfire, and Eke stated that he ran away from the scene.  Dkt. 63-1, at

23  767–72, 775–76.  Eke testified that while fleeing the scene, he encountered Petersen and that the

24

1    two went back to Miller's campsite.  Dkt. 63-1, at 779.  Petitioner then attacked Petersen, beating

2    him and choking him, again despite Eke's claimed attempts to intervene.  Dkt. 63-1, at 779–86.

3    Eke stated that petitioner then placed Petersen on the same campfire.  Dkt. 63-1, at 786–87.

4    Petitioner directed Eke to burn Miller's tent, and Durga and petitioner placed the victims' bodies

5    inside, to burn the bodies.  Dkt. 52-6, at 184.

6        Eke freely admitted that on prior occasions, he had lied about the events that occurred.

7    *See* Dkt. 63-1, at 721.  The prosecutor and defense counsel also brought out various

8    inconsistencies between Eke's trial testimony and earlier statements.  *See, e.g.*, Dkt. 63-1, at 775,

9    796–800; Dkt. 52-6, at 178, 204, 211, 215.

10                              **b.  Durga's Testimony**

11        For his part, Christopher Durga testified that Eke assaulted Cover (Dkt. 52-6, at 239) and

12    that when Durga took Eke's weapon away, Cover "pulled a knife out," and Durga kicked Cover,

13    knocking him out.  Dkt. 52-6, at 241.  Durga's testimony contradicted Eke's testimony in many

14    regards, including that Durga testified that it was Eke—not Durga—who was upset when he

15    learned that police had taken the weapon used to assault Cover.  *See* Dkt. 52-6, at 247, 316.

16        According to Durga, when the three went to Miller's campsite on the night of the

17    murders, Petersen was already present, and Petersen and Eke then left the campsite together.  *See*

18    Dkt. 52-6, at 265.  Durga testified that at some point after this, Miller struck Crow, and Durga

19    intervened, beating and choking Miller.  Dkt. 52-6, at 268–70.  According to Durga, Eke and

20    Petersen returned while Durga choked Miller unconscious and Eke grabbed Petersen and

21    wrestled him to the ground.  *See* Dkt. 52-6, at 274.  Durga stated that petitioner and Eke attacked

22    Petersen and that Peterson was knocked out.  Dkt. 52-6, at 282.  Durga testified that Petersen and

23

24

1    Miller were both still alive and passed out inside the tent, which was not on fire, when he and

2    petitioner left, with Eke following a few minutes behind.  Dkt. 52-6, at 286, 325–26.

3          As with Eke's testimony, the attorneys extensively inquired into various inconsistencies

4    between Durga's trial testimony and his prior versions of events.  *See, e.g.*, Dkt. 52-6, at 243–44,

5    267, 281, 336.  This included the detail about Durga kicking Cover in self-defense when Eke was

6    assaulting Cover—a detail Durga had not previously recounted.  Dkt. 52-6, at 243–44.  As noted,

7    Eke and Durga also contradicted each other in a variety of details—including, notably, Durga's

8    denial that he or petitioner placed either victim in the campfire and Durga's claim that petitioner

9    never told Eke to light the tent on fire with Miller and Petersen lying inside.  *E.g.* Dkt. 52-6, at

10   322, 331.  Durga also testified that he and petitioner considered each other as brothers.  Dkt. 52-

11   6, at 237.

12                      **3.  Prosecutor's Closing Argument**

13         In closing, the prosecutor argued that petitioner, Eke, and Durga took part in a "planned

14   action against David Miller to silence the snitch," leading to the murder of Miller and Petersen,

15   who was a witness to Miller's murder.  *See* Dkt. 52-6, at 96.  The prosecutor summarized

16   Durga's and Eke's testimony as supporting the State's theory.  Specifically, the prosecutor

17   argued that the evidence showed that petitioner had been involved in the assault on Cover; that

18   Eke, Durga, and petitioner were all concerned about Miller "snitch[ing]" and went to his

19   campsite to attack him; that Crow initiated the encounter with Miller, and then Durga choked

20   Miller while Eke kicked him; that Crow attacked Petersen, with Eke's assistance, after Petersen

21   witnessed Miller's murder; and that they burned the bodies inside the tent at the campsite to

22   cover their crime.  Dkt. 52-6, at 46, 56–57, 65, 71, 85–86, 91, 96.

23

24

1    As noted above, Durga's and Eke's accounts were inconsistent with each other and with

2    their prior statements.  Regarding these inconsistencies, the prosecutor noted that Durga and Eke

3    each had their own self-interest—and that Durga's version of events, which placed more blame

4    on Eke, was questionable since Durga and petitioner considered each other "brothers."  *See* Dkt.

5    52-6, at 87.  The prosecutor also pointed out obvious inconsistencies and impossibilities in

6    Durga's and Eke's testimony.  *See* Dkt. 52-6, at 45–52, 96.  For instance, the prosecutor

7    referenced Durga's testimony about the Cover assault, pointing out that in at least one regard his

8    testimony was "ludicrous" and stating that "Christopher Durga is a witness who is quite capable

9    of implanting these little bits of fantasy."  Dkt. 52-6, at 49.  The prosecutor exhorted the jury "to

10   glean the truth out of all this."  Dkt. 52-6, at 51.

### 4. State Court Holdings

12   Petitioner attacked the prosecutor's statements during closing in a personal restraint

13   petition, but Division Two rejected his arguments, finding no misconduct.  Dkt. 52-1, at 44–45.

14   The Supreme Court also denied review, concluding that the "challenged remarks were not

15   improper when viewed in context with Mr. Eke's and Mr. Durga's previous statements to law

16   enforcement and inconsistencies in their trial testimony"—including Eke's admission that he had

17   lied multiple times in prior statements.  *See* Dkt. 52-4, at 34.  The Court also referenced the

18   prosecutor's impeachment of Durga, noting that the inconsistencies in Durga's and Eke's

19   testimony "allowed the prosecutor to argue to the jury that Mr. Eke and Mr. Durga had motives

20   for lying about certain events."  Dkt. 52-4, at 34.  The Court concluded that "[n]othing that the

21   prosecutor said can be characterized as a clear and direct statement of personal opinion on these

22   witnesses' veracity, nor can the prosecutor's argument be described as testimony."  Dkt. 52-4, at

23   34

24

1

### 5.  Discussion

2      Here, petitioner asserts that the prosecutor went beyond reasonable inferences from

3 Durga's and Eke's testimony and testified himself during closing argument.  Petitioner cites

4 portions of the prosecutor's closing argument when he argued that Durga's and Eke's testimony

5 had to be evaluated with caution because both of them had been untruthful in certain regards.

6 *E.g.* Dkt. 52-6, at 49–51, 56, 70–74, 86–89, 111.  The prosecutor argued that by comparing their

7 inconsistent versions with each other and with other evidence of record, the jury could "glean the

8 truth out of all of this."  Dkt. 52-6, at 51.

9      As the state court reasonably concluded, however, when read in context with the trial

10 testimony, the prosecutor's comments did not constitute impermissible opinion testimony but

11 were arguments based on reasonable inferences from the trial testimony.  The prosecutor

12 referenced Durga's and Eke's testimony repeatedly throughout closing, pointing out

13 inconsistencies and biases that supported the State's theory of the case.  For instance, the

14 prosecutor pointed out that Durga's inconsistent account of events and his testimony that

15 petitioner was someone he considered as a "brother," reasonably arguing that Durga's account

16 was inconsistent with other evidence because Durga was attempting to protect petitioner.  Dkt.

17 52-6, at 50, 56, 72, 87.  The prosecutor is entitled to argue the State's theory of the case based on

18 reasonable inferences from the evidence, and the prosecutor did precisely this.

19      Inasmuch as petitioner argues that the prosecutor's argument to the jury to "glean the

20 truth" of what happened from Durga's and Eke's inconsistent accounts, the Court disagrees that

21 petitioner has shown misconduct.  A prosecutor may permissibly ask a jury to exercise its

22 common sense when examining the evidence and drawing inferences therefrom.  *See United*

23 *States v. Blueford*, 312 F.3d 962, 968 (9th Cir. 2002) ("It is certainly within the bounds of fair

24

1   advocacy for a prosecutor, like any lawyer, to ask the jury to draw inferences from the evidence

2   that the prosecutor believes in good faith to be true.").  Here, where the State's case included

3   witnesses whose testimony contained irreconcilable conflicts and significant inconsistencies, it

4   was permissible for the prosecutor to encourage the jury to use its common sense and to compare

5   the inconsistent accounts to discern what had happened on the night of the murders.

6        In short, petitioner's argument about alleged prosecutorial misconduct fails to show that

7   the Washington court unreasonably applied clearly established federal law and therefore should

8   be rejected.

9                     **B.  Failure to Disclose Exculpatory Evidence**

10                         **1.  Legal Standard**

11        In *Brady v. Maryland*, the Supreme Court held that the "suppression by the prosecution

12  of evidence favorable to an accused upon request violates due process where the evidence is

13  material either to guilt or punishment, irrespective of the good faith or bad faith of the

14  prosecution."  373 U.S. 83, 87 (1963).  *Brady* clearly established that the defendant must prove

15  three elements to show a *Brady* violation:  (1) the evidence at issue must be favorable to the

16  accused, because it is either exculpatory or impeachment material; (2) the evidence must have

17  been suppressed by the State, either willfully or inadvertently; and (3) prejudice must result from

18  the failure to disclose the evidence.  *Benn v. Lambert*, 283 F.3d 1040, 1052–53 (9th Cir. 2002).

19                     **2.  Facts Regarding Alleged Failure to Disclose**

20        Division Two summarized the facts underlying petitioner's claim of failure to disclose

21  jailhouse writings and a handwriting expert's report as follows:

22        An inmate named Aaron Adams provided the State with jailhouse writings
        that Eke allegedly wrote to him while both were in jail.  The jailhouse writings
23      created a conflict of interest between Adams and Crow, both of whom were
        represented by the same trial counsel.  Prior to trial, the trial court allowed trial

24

1    counsel to withdraw from Crow's case and transferred Crow's case to a new trial
     counsel.  The new trial counsel agreed that Crow's prior attorney could transfer all
2    of the State's discovery directly to him.

3           Later, an inmate named Anthony McKague provided the State with
     additional jailhouse writings allegedly written by Eke.  A handwriting expert
     examined the jailhouse writings along with Eke's and McKague's handwriting
4    samples, and filed a report stating he could not determine who wrote the jailhouse
     writings.

5           Following Crow's conviction, Crow sent a letter to trial counsel requesting
     the handwriting expert's report and the jailhouse writings.  Trial counsel responded
6    in a letter written on February 29, 2011, stating that:

7           I do not have any hand writing expert reports, nor do I have letters
            purported to be from you or letters written purportedly by Aaron
8           Adams or Anthony McKague actually written by Brian Eke.  I know
            for a fact I did not receive any hand writing expert reports.  If there
9           was one done, Assigned Counsel would have had to pay the expert
            who performed the analysis.  Since I had nothing to do with that
            analysis I have no record of it.

10   Br. of Petitioner at Ex. 5.  Based on this response, Crow alleges the State committed
     misconduct by failing to disclose the handwriting expert's report.

11          After Crow filed his PRP, trial counsel filed a declaration stating that the
     State properly provided him with all discovery, and that upon reviewing his files,
12   "it seems clear" that he was aware of the jailhouse writings at trial, particularly
     because he cross examined Eke regarding the materials. . . .  Trial counsel also
13   stated that some of Crow's case file had been destroyed, and that he interpreted
     Crow's request as limited to handwriting analysis ordered by the defense, rather
14   than by the State.

15   Dkt. 52-1, at 40–41.

16          Division Two concluded that petitioner had failed to present any evidence that documents

17   were missing because the State did not disclose them, rather than because trial counsel lost or

18   destroyed them, and therefore rejected petitioner's claim.  Dkt. 52-1, at 46.  In the ruling denying

19   review, the Supreme Court similarly concluded that petitioner's claim was based on a

20   "misinterpretation of" his former trial counsel's letter and affirmed Division Two's rejection of

21   this claim.  Dkt. 52-4, at 35.

22   ///

23   ///

24

### 3.  Discussion

In his habeas petition, petitioner reasserts his argument that the prosecutor failed to disclose jailhouse writings allegedly from Eke to McKague documenting a plot for McKague to give false testimony.  Petitioner also claims that the prosecutor knowingly adduced false testimony from McKague.  Dkt. 10-1, at 15.

In support of his petition, petitioner asserts that disclosure of the jailhouse writings and expert report "absolutely did not happen."  Dkt. 66, at 17.  However, petitioner provides no evidence, argument, or citation to the record that supports this point and controverts the state courts' conclusion that petitioner had fail to show that his counsel had not received and subsequently lost or destroyed the documents.

The record before the state court includes petitioner's PRP relying on his correspondence with former defense counsel, in which defense counsel stated that he did not have the report or jailhouse letters.  Dkt. 52-2, at 72.  However, in response to the PRP, the State provided the prosecutor's declaration stating that (regarding the letters purportedly between Eke and McKague) defense counsel was given a transcript of the recording of an interview of McKague, including McKague's recitation of the letters' contents.  Dkt. 52-2, at 534–35.  Defense counsel also provided his declaration that he knew that the State had provided him with all discovery it possessed or acquired during the trial, that portions of petitioner's file had been destroyed, and that defense counsel mistook petitioner's letter requesting a handwriting report as requesting a report from a defense expert.  Dkt. 52-2, at 571.  Defense counsel stated that review of the transcript made clear that he had been aware of the writings and the report since he cross examined the state's witnesses on the subject.  Dkt. 52-2, at 571.

1    Based on these materials, the state court reasonably determined that the evidence had, in

2    fact, been disclosed in light of the evidence before it, and petitioner's claim of failure to disclose

3    the jailhouse writings and handwriting report lacks merit.  Finally, the Court notes that petitioner

4    appears to raise a new argument of ineffective assistance of counsel related to defense counsel's

5    cross examination of McKague and Eke in his response to the Answer regarding this ground.

6    *See* Dkt. 66, at 17.  To the extent Petitioner raises new arguments for relief in his response to the

7    Answer, those arguments are not properly presented.  *Cacoperdo v. Demosthenes*, 37 F.3d 504,

8    507 (9th Cir. 1994) ("A Traverse is not the proper pleading to raise additional grounds for

9    relief.").

10    **C.  Alleged Witness Coercion**

11    Petitioner next asserts that the prosecutor threatened Durga, coercing him to testify

12    against petitioner, based on an affidavit that Durga provided to petitioner.  Dkt. 10-1, at 15.

13    **1.  Facts Regarding Alleged Coercion**

14    After petitioner argued in a PRP that the prosecutor threatened Durga, Division Two

15    transferred the matter to the superior court for a reference hearing "to determine whether the

16    prosecutor threatened Durga in order to compel him to provide false testimony implicating Crow

17    in Miller's murder."  Dkt. 52-3, at 64.  At the reference hearing, the superior court heard

18    testimony from Durga, Durga's trial attorney, the prosecutor, and a police officer who had

19    interviewed petitioner.  *See* Dkt. 52-3, at 77, 97, 155, 172–73.  Following the reference hearing,

20    the superior court found, among other things, that the prosecutor did not threaten Durga with

21    additional prison time if Durga did not testify that petitioner was involved in Miller's assault or

22    murder.  Dkt. 52-4, at 3.

23

24

1    Division Two then denied petitioner's PRP inasmuch as petitioner argued that the

2    prosecutor had coerced Durga to testify against petitioner, noting that petitioner did not challenge

3    the superior court's finding that the prosecutor had not threatened Durga.  Dkt. 52-1, at 43.  The

4    Supreme Court affirmed this conclusion and also noted that even if petitioner had challenged the

5    reference hearing finding, "that finding was amply supported by the evidence at the reference

6    hearing."  Dkt. 52-4, at 34–35.

7                                    **2.  Discussion**

8             If a habeas petitioner is in state custody pursuant to a state judgment, this Court must

9    presume that state court factual findings are correct.  "The applicant shall have the burden of

10   rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254.

11            Here, petitioner relies upon the same arguments and evidence that he relied upon in his

12   PRP filed in the state courts.  Specifically, petitioner cites to the affidavit that Durga submitted

13   and the transcript from the reference hearing.  *See* Dkt. 66, at 10–11.  Petitioner argues that

14   Durga's affidavit stating that the prosecutor threatened him with more prison time if he did not

15   testify pursuant to the plea agreement should be credited and shows that the prosecutor engaged

16   in improper conduct.  Dkt. 66, at 10.  But the state courts considered this same evidence,

17   including conducting the reference hearing at which, with the benefit of counsel, petitioner

18   elicited Durga's testimony that the prosecutor had allegedly threatened him if he did not testify

19   against petitioner and argued based on Durga's testimony and affidavit that the prosecutor had,

20   in fact, coerced Durga into testifying against petitioner.  *See* Dkt. 52-3, at 162–63.

21            Petitioner fails to come forward with evidence rebutting the presumption of correctness

22   of the state court's finding that the prosecutor did not intimidate Durga.  The superior court's

23   findings amply support its conclusions:  the superior court found that although Durga testified

24

that the prosecutor threatened him in front of Durga's defense attorney, Durga's defense attorney

testified that this never occurred. *See* Dkt. 52-4, at 4. In addition, Durga's defense attorney

contradicted Durga's claim that Durga had privately told his attorney that he had lied to the

police and been threatened. Dkt. 52-4, at 4. And the superior court found that Durga was an

unreliable historian because he did not allege that he was threatened by the prosecutor until after

petitioner's convictions became final on direct appeal, he remembered "very little about the

circumstances of the interviews between himself and [the prosecutor]," and he had a close

relationship with petitioner. Dkt. 52-4, at 4–5. Thus, petitioner fails to show that the state

court's adoption of the reference hearing finding that the prosecutor did not coerce Durga was an

unreasonable determination of the facts based on the record before the state court.

## V. Ground Eight: Ineffective Assistance of Appellate Counsel

Petitioner raises a number of claims of ineffective assistance of appellate counsel related

to the following issues that he claims his appellate counsel should have raised on direct appeal:

(1) failure of his trial counsel to request a jury instruction for a lesser included offense, (2) failure

to go over evidence with petitioner "only visiting him for 2 hours," (3) failure to call a material

witness, and (4) failure to object to the prosecutor's alleged misconduct during closing argument.

Dkt. 10-1, at 21.

### A. Legal Standard

Where a petitioner claims ineffective assistance of appellate counsel, petitioner

establishes prejudice by showing "a reasonable probability that, but for his counsel's

unreasonable failure to file a merits brief, he would have prevailed on his appeal." *Smith v.

Robbins*, 528 U.S. 259, 285 (2000). Appellate counsel has no constitutional obligation to raise

1    every nonfrivolous, colorable issue on appeal, but only those arguments most likely to succeed.

2    *Davila v. Davis*, 137 S. Ct. 2058, 2067 (2017); *Jones v. Barnes*, 463 U.S. 745, 751–54 (1983).

3                              **B.  Lesser Included Offense**

4            Petitioner asserts that on direct appeal, his appellate counsel should have argued that his

5    trial counsel rendered ineffective assistance by failing to request a jury instruction on first- and

6    second-degree manslaughter, a lesser included offense.  *See* Dkt. 10-1, at 21.

7                    **1.  Facts Regarding Lesser Included Offense Instruction**

8            At trial, petitioner's trial counsel stated on the record that he had thought "for a long

9    time" about whether to request a first- or second- degree manslaughter instruction but ultimately

10   decided not to because he did not think that the facts of the case "would fit into either the

11   reckless or negligence slot."  Dkt. 52-6, at 309.

12           As petitioner's trial counsel pointed out, a manslaughter conviction requires a finding that

13   a defendant "recklessly" or "with criminal negligence" caused the death of another.  *See* RCW

14   § 9A.32.060, .070.  At petitioner's trial, in contrast, the jury was instructed that second-degree

15   murder occurred if "with intent to cause the death of another person, [a defendant] causes the

16   death of such person" or "if [a defendant] commits assault in the second degree and in the course

17   of and in furtherance of such crime he or an accomplice causes the death of a person other than

18   one of the participants [i.e., a non-victim]."  Dkt. 52-2, at 104.  The jury was also instructed that

19   "evidence of intoxication may be considered in determining whether the defendant acted with

20   knowledge or intent."  Dkt. 52-2, at 103.

21           Petitioner's appellate counsel did not raise this issue on direct appeal but, in a PRP,

22   petitioner argued that his trial counsel rendered ineffective assistance by not requesting the

23

24

1  instruction.  *See* Dkt. 52-1, at 47.  The state court examined this claim and rejected it on its

2  merits, concluding that—

3          Here, there is at least a remote possibility Crow could have been acquitted
        on one or both murder charges.  The jury could have easily disbelieved the two
4        primary eyewitnesses against Crow (Eke and Durga) because they were complicit
        in the murder and made statements in their testimony inconsistent with their prior
5        statements to authorities.  The jury could have determined that reasonable doubt
        existed as to where Crow was at the time of one or both murders, and could have
6        determined that there was reasonable doubt as to whether Durga or Eke murdered
        the victims without Crow's assistance.  Thus, trial counsel did not provide Crow
7        with ineffective assistance because trial counsel's decision against requesting a
        lesser included manslaughter instruction is supported by the conceivable legitimate
8        strategy of pushing the jury into an all-or-nothing decision that could potentially
        have resulted in Crow's full acquitta1.
9  Dkt. 52-1, at 48.

10         The Court further rejected petitioner's related claim that his appellate counsel rendered

11  ineffective assistance on direct appeal by not raising this argument.  Dkt. 52-1, at 50 n.14.

12                              **2.  Discussion**

13         Petitioner argues that his counsel would have been able to argue that petitioner's

14  intoxication rendered him guilty only of manslaughter, not second-degree murder, had counsel

15  requested the manslaughter instruction.  Dkt. 66, at 19.  But counsel does not render ineffective

16  assistance by declining to request an instruction that is unsupported by the evidence.  *E.g.*

17  *Gonzales v. Muniz*, No. 513CV02319JAKSK, 2017 WL 6876192, at *4 (C.D. Cal. Sept. 27,

18  2017), *report and recommendation adopted*, No. 513CV02319JAKSK, 2017 WL 6820136 (C.D.

19  Cal. Oct. 25, 2017).  Here, petitioner's counsel stated on the record that he had considered at

20  length whether to request the manslaughter instruction but ultimately declined to do so based on

21  his judgment that the evidence did not support that petitioner had acted recklessly or negligently,

22  rather than intentionally.  This is a reasonable tactical decision, and counsel did not perform

23  deficiently.

24

1    Moreover, the jury was not instructed on any lesser included offense (*see* Dkt. 52-2, at

2    95–116) and Division Two reasonably determined that the decision not to request a jury

3    instruction on manslaughter was supported by the conceivable legitimate trial strategy of forcing

4    the jury into an all-or-nothing scenario, choosing between convicting defendant of second-degree

5    murder or acquitting him altogether.  This is not a situation where defense counsel's failure to

6    request the instruction was an oversight or mistake, and Division Two's analysis was a

7    reasonable interpretation of clearly established law.  *Compare Crace v. Herzog*, 798 F.3d 840,

8    852 (9th Cir. 2015) (counsel's failure to request an instruction on a lesser included offense was

9    deficient performance where counsel never considered the instruction and the jury was instructed

10    on another lesser offense).

11    In short, petitioner has failed to show that his counsel's decision to forego a manslaughter

12    instruction was not a strategic choice.  Indeed, petitioner does not even discuss his counsel's

13    stated reason for not pursuing a manslaughter instruction and has thus not met his burden to

14    show that his trial counsel's performance was deficient.  Accordingly, the state court reasonably

15    determined that petitioner could not prevail on his claim of ineffective assistance of appellate

16    counsel, since his claim of ineffective assistance of trial counsel in this regard lacked merit.

17    **C.  Time Spent with Petitioner**

18    Petitioner asserts that his appellate counsel rendered ineffective assistance by not arguing

19    that because trial counsel "only spent 2 hours total with" petitioner and did not go over the

20    evidence with him, trial counsel's assistance was ineffective.  Dkt. 10-1, at 21.

21    The state Supreme Court disagreed when petitioner raised this argument in a petition for

22    review, concluding—

23        Mr. Crow presents no evidence that counsel failed to adequately investigate and
         research a defense or that counsel was unprepared.  Mr. Crow presented jail records

24

1    showing that defense counsel signed in to see him only two times.  The jail did not
2    require attorneys to sign in to visit clients, and thus it is possible counsel saw him
     more often.  In any event, Mr. Crow presents no evidence regarding the time
     counsel worked on his case outside of jail visitation. The records provided indicate
3    that defense counsel was a well-prepared and vigorous advocate.

4    Dkt. 52-4, at 36.  Thus, the Supreme Court disagreed that appellate counsel was ineffective for

5    not raising this issue on direct appeal.  Dkt. 52-4, at 37.

6    In support of his habeas petition, petitioner continues to rely on the jail records and

7    argues that "two hours is not enough time for an attorney to spend with his client in such a

8    complicated case." Dkt. 66, at 19.  But this does not show that the state court unreasonably

9    determined that petitioner had not provided any evidence that counsel spent time working on his

10   case outside of visitation and that his counsel was well-prepared and a vigorous advocate.

11   Petitioner's bare allegation that spending two hours with him in preparation for his case

12   necessarily renders counsel's assistance ineffective also fails.  *Accord Chester v. Boone*, 13 F.3d

13   404 (10th Cir. 1993) (limited time spent consulting with counsel did not amount to ineffective

14   assistance of counsel).  Petitioner does not show that the Supreme Court unreasonably applied

15   clearly established federal law when it rejected his claim of ineffective assistance of appellate

16   counsel in this regard.

17                      **D.  Failure to Call Witness**

18   Petitioner argues that his counsel should have called a witness—Aaron Adams—who

19   supposedly would have testified that Eke offered Adams $15,000 to testify untruthfully and that

20   appellate counsel was ineffective for not raising this argument on direct appeal.  Dkt. 10-1, at 21.

21   The Supreme Court also resolved this argument against petitioner, disagreeing that

22   appellate counsel was ineffective after holding—

23   Mr. Crow's complaint that counsel failed to call Aaron Adams as a witness fails
24   because counsel had legitimate tactical reasons not to call Mr. Adams.  Counsel

REPORT AND RECOMMENDATION - 31

1
2
stated on the record that he was not calling Mr. Adams because his testimony would have benefitted the State. Counsel was correct, since Mr. Adams claimed that Mr. Crow told him that he fought with one of the victims at the crime scene. Such testimony would have contradicted Mr. Crow's claim that he was not there.

3
Dkt. 52-4, at 36–37.

4
Petitioner again fails to show that the state court unreasonably determined the facts or

5
applied the law. He does not provide any evidence or argument challenging his trial counsel's

6
statement, on the record, that it would likely damage petitioner's case to call Adams as a witness

7
because Adams "adds to the State's case if he were to testify." *See* Dkt. 66. Petitioner provides

8
notes from an interview of Adams, but these notes indicate that Adams not only would have

9
testified that petitioner was present at the scene on the night of the murders but that petitioner

10
admitted that he got into a fight with Miller, beat him up, and left him in the tent. *See* Dkt. 66, at

11
90.

12
The state Supreme Court reasonably concluded that petitioner could not prevail on his

13
claim that appellate counsel rendered ineffective assistance in this regard, since petitioner's

14
counsel had made a reasonable tactical decision not to call Adams as a witness. Thus, petitioner

15
fails to show that the state court unreasonably rejected his claim of ineffective assistance of

16
appellate counsel.

17
### E. Prosecutorial Misconduct

18
As noted above, the prosecutor did not commit misconduct during the instances of

19
closing argument that petitioner cites. Therefore, petitioner cannot show that appellate counsel

20
would likely have succeeded had counsel raised an argument related to failure to object to the

21
alleged misconduct. Petitioner's claim of ineffective assistance of appellate counsel related to

22
failure to raise his trial counsel's lack of objection to alleged prosecutorial misconduct fails.

23
///

24

1    **VI.  Ground Nine:  Jury Unanimity**

2        Petitioner asserts that his jury was not unanimous as to whether he committed second

3    degree intentional murder or felony murder.  *See* Dkt. 10-1, at 23.

4        Division Two rejected petitioner's argument, noting that in Washington, the right to jury

5    unanimity is the right to have the jury be unanimous as to "which act or incident constituted the

6    crime" but not "the legal means by which the defendant committed the crime (such as felony

7    murder versus intentional murder), as long as sufficient evidence supports each alternative on

8    which evidence or argument was presented."  Dkt. 52-1, at 52; *see also State v. Armstrong*, 188

9    Wn.2d 333, 340 (2017).  Division Two held—

10           Eke's testimony supported that Crow hit Miller in the face, followed
11       immediately by Durga putting Miller in a choke hold until Miller was incapacitated
         and dragging his body into the campsite fire.  The Olympia police found Miller's
12       dead body in the campsite fire.  This is sufficient evidence that Crow was an
         accomplice to Durga's intentional murder of Miller (which establishes intentional
13       murder) or that Crow committed a felony assault that allowed Durga to get Miller
         in a choke hold, causing Miller's death (which establishes felony murder).  Thus,
14       sufficient evidence supports both intentional murder and felony murder in regards
         to Miller.
15           Eke's testimony at trial also supported that Crow put Peterson in a choke
         hold until Peterson was incapacitated, threw his body into the campsite fire, and
16       stepped on his shoulders while Peterson was in the fire.  The Olympia police found
         Peterson's dead body at the campsite. This is sufficient evidence that Crow
17       intentionally strangled Peterson to death (intentional murder), or that Crow
         assaulted Peterson by strangling him, and that this assault caused his death (felony
18       murder).  Thus, because sufficient evidence supports both means for each of the
         two murders, the jury did not have to be unanimous as to whether Crow committed
         intentional murder or felony murder for either murder.
19   Dkt. 52-1, at 53–54.

20       The United States Supreme Court has recently held that in state court proceedings for

21   serious crimes, there is a right to have all twelve jurors agree that a defendant is guilty, so that

22   one single vote to acquit renders a guilty verdict unconstitutional.  *Ramos v. Louisiana*, 140 S.

23   Ct. 1390, 1397 (2020).  However, the Court has never held that the jury must also be unanimous

24

1    as to the means by which a defendant committed the crime, in a case where alternative means are

2    argued to the jury.  Indeed, the Court has distinguished between unanimity that defendant

3    committed the crime of conviction (required by *Ramos*) and unanimity as to *how* the defendant

4    committed the crime (not required by *Ramos*).  *See Schad v. Arizona*, 501 U.S. 624, 630 (1991)

5    (plurality) ("Even assuming a requirement of jury unanimity *arguendo,* that assumption would

6    fail to address the issue of what the jury must be unanimous about.  Petitioner's jury was

7    unanimous in deciding that the State had proved what, under state law, it had to prove: that

8    petitioner murdered either with premeditation or in the course of committing a robbery.  The

9    question still remains whether it was constitutionally acceptable to permit the jurors to reach one

10    verdict based on any combination of the alternative findings.").

11         Because there is no clearly established federal right to a jury that is unanimous regarding

12    the legal means by which a crime was convicted, petitioner's argument necessarily relies on state

13    law and is not cognizable in this habeas petition.

14

15                     **CERTIFICATE OF APPEALABILITY**

16         A petitioner seeking post-conviction relief under 28 U.S.C. § 2254 may appeal a district

17    court's dismissal of the federal habeas petition only after obtaining a certificate of appealability

18    (COA) from a district or circuit judge.  A certificate of appealability may issue only if petitioner

19    has made "a substantial showing of the denial of a constitutional right."  *See* 28 U.S.C. §

20    2253(c)(2).  Petitioner satisfies this standard "by demonstrating that jurists of reason could

21    disagree with the district court's resolution of his constitutional claims or that jurists could

22    conclude the issues presented are adequate to deserve encouragement to proceed further."

23    *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (*citing Slack v. McDaniel*, 529 U.S. 473, 484

24

1   (2000)).  Pursuant to this standard, this Court concludes that petitioner is entitled to a certificate

2   of appealability with respect to this petition.

3

4                                    **CONCLUSION**

5          For the reasons set forth herein, the petition for habeas corpus should be denied, a

6   certificate of appealability should issue, and the matter should be closed.

7          Pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have

8   fourteen (14) days from service of this Report to file written objections.  *See also* Fed. R. Civ. P.

9   6.  Failure to file objections will result in a waiver of those objections for purposes of *de novo*

10  review by the district judge, *see* 28 U.S.C. § 636(b)(1)(C), and can result in a result in a waiver

11  of those objections for purposes of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Miranda v.*

12  *Anchondo*, 684 F.3d 844, 848 (9th Cir. 2012) (citations omitted). Accommodating the time limit

13  imposed by Fed. R. Civ. P. 72(b), the clerk is directed to set the matter for consideration on

14  September 4, 2020, as noted in the caption.

15         Dated this 20th day of August, 2020.

16

17

18

19                                    J. Richard Creatura
                                      United States Magistrate Judge

20

21

22

23

24